Samuel H. Ruby, SBN 191091
E-mail: samuel.ruby@bullivant.com
Kevin K. Ho, SBN 233408
E-mail: kevin.ho@bullivant.com
BULLIVANT HOUSER BAILEY PC
601 California Street, Suite 1800
San Francisco, California 94108
Telephone: 415.352.2700
Facsimile: 415.352.2701

Steven M. Crane, SBN 108930
E-mail: scrane@bcrslaw.com
BERKES CRANE ROBINSON & SEAL LLP
515 South Figueroa Street, Suite 1500
Los Angeles, CA 90071
Telephone: (213) 955-1150
Facsimile: (213) 955-1155

*Attorneys for Plaintiff The Continental
Insurance Company*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THE CONTINENTAL INSURANCE COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>JOHN JOSEPH COTA; REGAL STONE LIMITED; FLEET MANAGEMENT LIMITED and the *M/V COSCO BUSAN (aka HANJIN VENEZIA)*, LR/IMO Ship No. 9231743 her engines, apparel, electronics, tackle, boats, appurtenances, etc., *in rem*,<br><br>Defendants. | Case No.: 3:08-cv-2052-SC as related to: 07-cv-5800-SC, 07-cv-6045-SC, and 07-cv-5926-SC<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF, INDEMNITY AND REIMBURSEMENT** |

Plaintiff, The Continental Insurance Company, alleges the following:

## SUBJECT MATTER JURISDICTION

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1333 (admiralty jurisdiction), in that, as set forth more fully below, the action concerns a maritime contract; specifically, a contract of marine insurance.

– 1 –

1  2.    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332

2  (diversity jurisdiction), in that, as set forth more fully below, there is complete diversity of

3  citizenship between the plaintiff and the defendants, and the amount in controversy as to each

4  defendant exceeds $75,000.

5  3.    If, notwithstanding the foregoing allegations, any claim asserted herein is not

6  within the Court's admiralty or diversity jurisdiction, the Court nonetheless has subject matter

7  jurisdiction over the claim pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction), in that, as

8  set forth more fully below, the claim is so related to the claims in the action within the Court's

9  admiralty or diversity jurisdiction that it forms a part of the same case or controversy.

10  4.    The Court also has jurisdiction under Fed. Rule of Civ. Proc 9(h) to apply

11  Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture.

12  **VENUE**

13  5.    Venue is proper pursuant to 28 U.S.C. § 1391 in that, as set forth more fully

14  below, the substantial part of the events or omissions giving rise to this claim occurred in the

15  County of San Francisco.

16  **INTRADISTRICT ASSIGNMENT**

17  6.    Pursuant to Local Rule 3-2(c-d), this action is assignable to the San Francisco

18  Division or the Oakland Division, because a substantial part of the events or omissions giving

19  rise to this claim occurred in the County of San Francisco.

20  **COMMON ALLEGATIONS**

21  7.    The Continental Insurance Company ("Continental") is a citizen of Pennsylvania

22  and Illinois.  Continental is a corporation organized and existing under the laws of

23  Pennsylvania.  Continental's principal place of business is in Chicago, Illinois.

24  8.    Captain John Joseph Cota ("Cota") is a citizen of California.  Cota is domiciled

25  in and is a resident of California.

26  9.    Cota was licensed by the United States Coast Guard and the State of California

27  as a pilot of maritime vessels.

28

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF, INDEMNITY AND REIMBURSEMENT

10.     Cota is a member of the San Francisco Bar Pilots Association ("the SF Bar Pilots"), an association of persons who guide vessels entering or exiting the waters of San Francisco Bay.

11.     Continental issued a policy of insurance, No. H856049 ("the Policy"), to the SF Bar Pilots, the San Francisco Bar Pilots Benevolent Association, and their officers, employees, and individual member pilots, including Cota.

12.     A true and correct copy of the Policy is attached hereto as *Exhibit A*.

13.     Regal Stone Limited ("Regal Stone") is a citizen of a foreign nation headquartered in Hong Kong, Special Administrative Region of the People's Republic of China.

14.     Fleet Management Limited ("Fleet Management") is a citizen of a foreign nation headquartered in Hong Kong, Special Administrative Region of the People's Republic of China.

15.     At all material times herein, Regal Stone and Fleet Management was each an owner, operator, or demise or bareboat charterer of the maritime vessel known as of November 7, 2007, as the *Cosco Busan*, "LR/IMO" ship number 9231743, flagged in Hong Kong and which may currently be known as the *Hanjin Venezia*.

16.     On November 7, 2007, the *Cosco Busan*, her engines, apparel, electronics, tackle, boats, appurtenances, etc., *in rem*, were within the navigable waters of this District and within the jurisdiction of this Court.

17.     Prior to or about November 7, 2007, Regal Stone, Fleet Management and/or the *Cosco Busan* hired Cota to pilot the *Cosco Busan* during its anticipated exit from the Port of Oakland and departure from San Francisco Bay.

18.     California Harbors & Navigations Code § 1198(c) provides, in pertinent part:

> Every vessel, owner, operator, or demise or bareboat charterer hiring a pilot with a state license for the Bays of San Francisco, San Pablo, and Suisun shall either defend, indemnify, and hold harmless pilots pursuant to paragraph (1), or alternatively, notify pilots of an intent to pay for trip insurance to paragraph (2).  If a vessel or its owner, operator, or demise or bareboat charterer does not provide written notice pursuant to paragraph (2) of an intent to exercise the trip insurance option, then the vessel and its owner, operator, and demise or bareboat charterer will be deemed to have elected the obligation to defend, indemnify, and hold harmless pilots pursuant to paragraph (1).

– 3 –

1      (1)    (A)***

2             (B) A vessel subject to this paragraph and its owner,
              operator, and demise or bareboat charterer shall defend,
3             indemnify, and hold harmless the pilot, any organization
              of pilots to which the pilot belongs, and their officers and
4             employees, with respect to liability arising from any claim,
              suit, or action, by whomsoever asserted, resulting in
5             whole, or in part, from any act, omission, or negligence of
              the pilot, any organization of pilots to which the pilot
6             belongs, and their officers and employees....

7             (C) *****

8             (D) A pilot who is the prevailing party shall be awarded
              attorneys' fees and costs incurred in any action to enforce
9             a right of indemnification provided pursuant to this
              subdivision.
10

11     19.    Neither Regal Stone, Fleet Management, nor the *Cosco Busan* notified Cota or

12     anyone else of an intent to pay for trip insurance to paragraph (2) of Harbors and Navigations

13     Code § 1198(c).

14     20.    Consequently, Regal Stone, Fleet Management, and the *Cosco Busan* are deemed

15     to have elected to defend, indemnify, and hold harmless Cota pursuant to paragraph (1) of

16     Harbors and Navigations Code § 1198(c).

17     21.    On November 7, 2007, Cota did pilot the *Cosco Busan* during its exit from the

18     Port of Oakland and intended departure from San Francisco Bay.

19     22.    While Cota was piloting the *Cosco Busan*, it allided with and struck the Delta

20     span of the San Francisco-Oakland Bay Bridge.

21                              **FIRST CAUSE OF ACTION**

22                       **(Indemnity – As To Civil Defense Costs)**

23                  **(Against Regal Stone, Fleet Management and *Cosco Busan*)**

24     23.    Continental incorporates by reference the allegations of paragraphs 1 to 22 above

25     and realleges them as if set forth fully herein.

26     24.    In connection with the allision, several claims (subsequently developing into civil

27     actions) were brought against Cota: (a) *United States v. M/V Cosco Busan, et al.*, U.S.D.C.

28     N.D. Cal. Case No.: 07-cv-06045; *Chelsea LLC et al. v. Regal Stone, Ltd., et. al.*, U.S.D.C. N.D.

                                          – 4 –

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF, INDEMNITY AND REIMBURSEMENT

1   Cal. Case No.: 07-cv-05800; and *Shogren Living Trust et al. v. Regal Stone, Ltd., et al.*

2   (U.S.D.C. N.D. Cal. Case No.: 07-cv-05926) (hereinafter, "the Civil Claims").

3       25.    Under Harbors and Navigations Code § 1198(c), Cota tendered his defense

4   against the Civil Claims to Regal Stone, Fleet Management, and the *Cosco Busan*.

5       26.    Initially, Regal Stone, Fleet Management, and the *Cosco Busan* declined to

6   defend Cota against the Civil Claims.

7       27.    Cota also tendered his defense of the Civil Claims to Continental.

8       28.    Under a reservation of rights, Continental accepted the tender and appointed civil

9   defense counsel for Cota at Continental's expense.

10       29.    While defending Cota against the Civil Claims, Continental requested that Regal

11   Stone, Fleet Management, and the *Cosco Busan* assume the defense and reimburse Continental

12   for defense costs incurred, pursuant to Harbors and Navigations Code § 1198.

13       30.    Only after several months did Regal Stone, Fleet Management, and the *Cosco

14   Busan* assume the defense of Cota against the Civil Claims.

15       31.    In the meantime, Continental paid of all of Cota's attorneys' fees, experts' fees,

16   and other costs relating to the defense of the Civil Claims, without application or recovery of

17   any deductible, in the total amount of at least $315,321.31.

18       32.    Having defended Cota and paid all of his defense costs in the Civil Claims,

19   Continental is completely subrogated to his legal rights, including his rights to defense and

20   indemnification by Regal Stone, Fleet Management and the *Cosco Busan* under Harbors and

21   Navigations Code § 1198(c).

22       33.    Additionally, or alternatively, Continental is directly entitled to equitable

23   indemnity or contribution from Regal Stone, Fleet Management and the *Cosco Busan*.

24       34.    By subrogation to Cota's indemnity rights, and/or by direct indemnity or

25   contribution rights, Continental is entitled to recover from Regal Stone, Fleet Management and

26   the *Cosco Busan* the costs incurred by Continental in defending Cota in connection with the

27   Civil Claims.

28

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF, INDEMNITY AND REIMBURSEMENT

35.     Pursuant to Harbors & Navigations Code § 1198(c)(1)(D), Continental is also entitled to recover attorneys' fees that is has and will continue to incur to enforce the obligations of Regal Stone, Fleet Management and the *Cosco Busan.*

WHEREFORE, Continental prays for relief as set forth below.

### SECOND CAUSE OF ACTION

### (Declaratory Relief – As To Coverage)

### (Against Cota)

36.     Continental incorporates by reference the allegations of paragraphs 1 to 35 above and realleges them as if set forth fully herein.

37.     In connection with the allision, the United States Department of Justice (United States Attorney's Office) commenced a criminal investigation in which Cota was identified as a "target" ("the Criminal Investigation").

38.     On March 17, 2008, the United States filed an indictment against Cota alleging certain criminal charges (*United States v. John Joseph Cota*, U.S.D.C. N.D. Cal., Case No.: 08-cr-160) ("the Original Indictment").

39.     On April 22, 2008, the United States filed a superseding indictment against Cota, alleging the original charges and two new charges ("the Superseding Indictment").

40.     Attached hereto as ***Exhibit B*** is a true and correct copy of the Original Indictment and a true and correct copy the Superseding Indictment.

41.     Cota contends that Continental was and is obligated to defend him (or indemnify him against his costs of his defense) in connection with the Criminal Investigation, the Original Indictment, and the Superseding Indictment.

42.     Continental denies it is or ever was obligated to defend Cota (or indemnify him against his costs of his defense) in connection with the Criminal Investigation, the Original Indictment, or the Superseding Indictment.

43.     There exists an actual and justiciable controversy between Continental and Cota.

44.     The controversy can be resolved by a judicial declaration of the parties' rights and obligations under the Policy and the law.

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF, INDEMNITY AND REIMBURSEMENT

1    WHEREFORE, Continental prays for relief as set forth below.

2    ### THIRD CAUSE OF ACTION

3    ### (Reimbursement – Of Criminal Defense Costs Paid)

4    ### (Against Cota)

5    45.    Continental incorporates by reference the allegations of paragraphs 1 to 44 above

6    and realleges them as if set forth fully herein.

7    46.    Since filing its original Complaint in this action, and without waiver of the

8    Second Cause of Action set forth above, and subject to other reservations of rights, Continental

9    has agreed to reimburse Cota and has reimbursed him for some criminal defense costs, in excess

10   of $100,000.00.

11   47.    Pursuant to *Buss v. Superior Court*, 16 Cal. 4th 35 (1997), Continental reserved

12   the right to seek reimbursement from Cota of such payments if it is determined that Continental

13   had no duty to make them.

14   48.    As set forth above, Continental indeed has no duty (and has never had any duty)

15   to defend Cota (or indemnify him against his costs of his defense) in connection with the

16   Criminal Investigation, the Original Indictment, or the Superseding Indictment.

17   49.    Accordingly, Continental is entitled to reimbursement from Cota of the criminal

18   defense costs that it has paid on his behalf.

19   WHEREFORE, Continental prays for the relief set forth below.

20   ### FOURTH CAUSE OF ACTION

21   ### (Declaratory Relief)

22   ### (Against All Defendants)

23   50.    Continental incorporates by reference the allegations of paragraphs 1 to 49 above

24   and realleges them as if set forth fully herein.

25   51.    In addition to tendering his defense of the Criminal Investigation, the Original

26   Indictment, and the Superseding Indictment to Continental, Cota tendered his defense of one or

27   more said matters to Regal Stone, Fleet Management, and/or the *Cosco Busan*.

28

– 7 –

52.    Cota contends that under Harbors & Navigations Code § 1198(c), if a vessel, its owners, operators, and/or charterers elect not to purchase trip insurance, then they are obligated to defend and indemnify the pilot not only against civil liability but also against criminal liability.

53.    On that basis, Cota contends that Regal Stone, Fleet Management, and/or the *Cosco Busan* are also obligated to defend Cota (or indemnify him against his costs of his defense) in connection with the Criminal Investigation, the Original Indictment, and the Superseding Indictment.

54.    Continental contends that if Cota is correct that Regal Stone, Fleet Management, and the *Cosco Busan* have such obligations, and if Cota is also correct that Continental also has such obligations, then the obligations of Regal Stone, Fleet Management and the *Cosco Busan* are primary and Continental has no duty to contribute to Cota's criminal defense or indemnification unless and until the duties of Regal Stone, Fleet Management, and the *Cosco Busan* are somehow excused or exhausted.

55.    Continental is informed and believes and on that basis alleges that Regal Stone, Fleet Management, and the *Cosco Busan* dispute Continental's contentions.

56.    There exists an actual and justiciable controversy between Continental and the defendants.

57.    The controversy can be resolved by a judicial declaration of the parties' rights and obligations under the Policy and the law.

WHEREFORE, Continental prays for relief as set forth below.

## FIFTH CAUSE OF ACTION

### (Indemnity – As To Criminal Defense Costs)

### (Against Regal Stone, Fleet Management and *Cosco Busan*)

58.    Continental incorporates by reference the allegations of paragraphs 1 to 58 above and realleges them as if set forth fully herein.

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF, INDEMNITY AND REIMBURSEMENT

1    59.    To the extent of Continental's payments to Cota and/or his attorneys for Cota's criminal defense costs, Continental is subrogated to Cota's indemnity rights against any other parties.

60.    If Cota is correct that under Harbors & Navigations Code § 1198(c), Regal Stone, Fleet Management and the *Cosco Busan* are obligated to defend and indemnify him against criminal liability, then by virtue of Continental's subrogation to Cota's rights, Regal Stone, Fleet Management and the *Cosco Busan* are obligated to indemnify Continental for criminal defense costs that Continental has paid.

61.    Additionally, or alternatively, Continental is directly entitled to equitable indemnity or contribution from Regal Stone, Fleet Management and the *Cosco Busan*.

62.    Pursuant to Harbors & Navigations Code § 1198(c)(1)(D), Continental is also entitled to recover attorneys' fees that is has and will continue to incur to enforce the obligations of Regal Stone, Fleet Management and the *Cosco Busan*.

WHEREFORE, Continental prays for relief as set forth below.

## **PRAYER**

As relief for the causes of action set forth above, Continental prays:

1.    For a judicial declaration:

    (a)    that Continental has no duty (and has never had a duty) to defend or indemnify Cota in connection with the Criminal Investigation, the Original Indictment, or the Superseding Indictment;

    (b)    *or, in the alternative*, that Regal Stone, Fleet Management, and the *Cosco Busan* have been obligated to defend and indemnify Cota; that their obligations are primary as compared to Continental's; and that Continental shall have no duty to contribute to Cota's defense or indemnification unless and until the duties of Regal Stone, Fleet Management, and the *Cosco Busan* are excused or exhausted.

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF, INDEMNITY AND REIMBURSEMENT

1    2.      For a money judgment against Regal Stone, Fleet Management, and the *Cosco*

2  *Busan* for at least $315,321.31, plus prejudgment interest, plus attorneys' fees pursuant to

3  Harbors & Navigations Code § 1198(c)(1)(D), and either:

4            (c)     A money judgment against Cota in the amount of criminal defense costs

5                    paid on his behalf, to be proven at trial, plus prejudgment interest,

6            (d)     Or, in the alternative, that criminal defense costs paid on his behalf, to be

7                    proven at trial, plus prejudgment interest, plus attorneys' fees pursuant to

8                    Harbors & Navigations Code § 1198(c)(1)(D), be assessed against Regal

9                    Stone, Fleet Management, and the *Cosco Busan* as part of the money

10                    judgment against those defendants.

11    3.      For costs of suit; and

12    4.      For such other and further relief as the Court may deem just and proper.

13  DATED:  June 13, 2008

BULLIVANT HOUSER BAILEY PC

By _____
     Samuel H. Ruby
     Kevin K. Ho

Attorneys for Plaintiff
The Continental Insurance Company

10604522.2

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF, INDEMNITY AND REIMBURSEMENT

# **EXHIBIT A**



# POLICY OF INSURANCE

**POLICY NO.:**           **H 856049**

**ASSURED:**           **San Francisco Bar Pilots, et al, as attached**

**INTEREST INSURED:**      **Primary Trip Insurance and Pilot's Contingent Legal Liability**

**AMOUNT INSURED HEREIN:**    **$1,000,000 Combined Single Limit**

**FROM:**               **January 1, 2007, 0001 hours, PST**

**TO:**                  **January 1, 2008, 0001 hours, PST**

# Table of Contents

**Section A – General Conditions**

**Section B – Primary Trip Insurance**

**Section C - Pilot's Contingent Legal Liability Insurance**

# SECTION A

## General Conditions Applicable to All Policy Sections

**ASSURED:**   San Francisco Bar Pilots, The San Francisco Bar Pilots Benevolent Association and their officers and employees and the individual Pilot performing the services insured hereunder.

**LOSS PAYEE:**   Assured, or order.

**COVERAGE:**   Section B – Primary Trip Insurance
Section C – Pilot's Contingent Legal Liability Insurance

**PERIOD:**   January 1, 2007, 0001 hours, Pacific Standard Time to
January 1, 2008, 0001 hours, Pacific Standard Time

**LIMIT OF LIABILITY & SUM INSURED:**   $1,000,000 any one accident or occurrence, both sections combined.

**CONDITIONS:**   As per manuscript wordings (including Pollution Exclusion and Buyback clause) attached hereunder.

**PREMIUM:**   This policy is issued in consideration of a Minimum and Deposit Premium of $70,335 (payable quarterly) subject to premium adjustment at policy expiration at a rate of:

Section B - $129.35 per each trip, shift or engagement where the Owner/Operator elects to purchase coverage.

Section C - $9.49 per each trip, shift or engagement where the Owner/Operator elects not to purchase the coverage described in Section B hereunder.

**REPORTS:**   The Assured agrees to provide monthly reports to Marsh Risk and Insurance Services which provide the names of all vessels accepting or declining coverage under Section B.

S:\dep\mari-Marine and Energy\SFBP\2007\Primary Trip and Legal Liability Policy (d).doc

# POLLUTION EXCLUSION AND BUYBACK CLAUSE

## Applicable to All Policy Sections

Such coverage as is afforded by this policy shall not apply to any claim arising out of the discharge, dispersal, release, or escape of smoke, vapors, soot, fumes, alkalis, toxic chemicals, liquids or gases, waste materials, oil or other petroleum substance or derivative (including any oil refuse or oil mixed wastes) or other irritants, contaminants or pollutants into or upon land, the atmosphere, or any watercourse or body of water.

This exclusion shall not apply, however, provided that the Assured establishes that all of the following conditions have been met:

(a) The occurrence was accidental and was neither expected nor intended by the Assured. An occurrence shall not be considered unintended or unexpected unless caused by some intervening event neither foreseeable nor intended by the Assured.

(b) The occurrence can be identified as commencing at a specific time and date during the term of this policy.

(c) The occurrence became known to the Assured within 7 days after its commencement.

(d) The occurrence was reported in writing to these underwriters within 90 days after having become know to the Assured.

(e) The occurrence did not result from the Assured's intentional and willful violation of any government statue, rule or regulation.

Nothing contained in this Endorsement shall operate to provide any coverage with respect to:

(1) loss of, damage to or loss of use of property directly or indirectly resulting from subsidence caused by sub-surface operations of the Assured;

(2) removal of, loss or damage to sub-surface oil, gas or any other substance;

(3) fines, penalties, punitive damages, exemplary damages, treble damages or any other damages resulting from the multiplication of compensatory damages;

(4) any site or location used in whole or in part for the waste, processing, treatment, storage, disposal or dumping of any waste materials or substances or the transportation of any waste materials or substances.

Notwithstanding any other provision of this policy or any underlying insurance, this policy of insurance is not evidence of financial responsibility under the Oil Pollution Act of 1990 or any

similar federal or state laws.  Any showing or offering of this policy by the Assured as evidence of insurance shall not be taken as any indication that the Underwriters consent to act as guarantor or to be sued directly in any jurisdiction whatsoever.  The Underwriters do not consent to be guarantors or to be sued directly.

**ALL OTHER TERMS AND CONDITIONS REMAINING UNCHANGED**

S:\dep\mari-Marine and Energy\SFBP\2007\Primary Trip and Legal Liability Policy (d).doc

# SECTION B

## Primary Trip Insurance

Subject to the terms and conditions set forth within this policy, Underwriters as shown below, hereinafter referred to as the Assurer, do insure the individual Pilot providing services, the San Francisco Bar Pilots, The San Francisco Bar Pilots Benevolent Association and their officers and employees hereinafter called the Assured, in the sum as stated above against the hereinafter described losses and liabilities arising out of, or relating to, directly or indirectly the acts, omissions or negligence of licensed pilots, officers or employees of San Francisco Bar Pilots in connection with the provision of pilotage service, provided that such losses and liabilities occur while a licensed pilot or authorized trainee from San Francisco Bar Pilots is piloting the vessel on whose behalf this policy has been procured.

The coverage provided by this policy attaches solely to the individual vessel movement for which trip insurance has been ordered pursuant either to the provisions of California Senate Bill No. 1109 or to private agreement between the Assured and the owners, master, operators, charterers or agents of the vessel. The period of the coverage hereunder is limited to the period the pilot is aboard the vessel or piloting services are provided.

The Assurer hereby undertakes to make good to the Assured or successors, all such loss and/or damage and/or expenses as the Assured shall have sustained and/or shall have become legally liable to pay on account of the consequences of acts, omissions or negligence of either licensed pilots of the San Francisco Bar Pilots and The San Francisco Bar Pilots Benevolent Association, or officers or employees of San Francisco Bar Pilots and The San Francisco Bar Pilots Benevolent Association: provided, however, that such insurance provides coverage only for that proportion of losses, damages and expenses sustained by the Assured, or other parties, which are proximately caused by the acts, omissions or negligence of the Assured and that no coverage is provided for losses, damages and expenses resulting from any other cause whatsoever.

1.  The Assured under this policy is protected and indemnified for losses and damages resulting from liabilities, risks, events, happenings and/or occurrences set forth within this policy including but not limited to:

    (a) For loss or damage that may be caused to the vessel being navigated by the pilot.

    (b) For loss or damage that may be caused to any vessel, or waterborne craft of any description, by the vessel being navigated by the pilot.

    (c) For loss or damage that may be caused to any wharves, piers, stages and similar structures, or any other property afloat or ashore, by the vessel being navigated by the pilot.

S:\dep\mari-Marine and Energy\SFBP\2007\Primary Trip and Legal Liability Policy (d).doc

(d) For loss or damage, whether by collision or otherwise, which may be caused to any goods, merchandise, equipment or other thing of value whatsoever, whether on board any vessel or waterborne craft, or not, or to any vessel or waterborne craft, pier, jetty, or other movable or fixed thing whatsoever.

(e) For loss of life or personal injury, whether by collision or otherwise, to any person other than employees of San Francisco Bar Pilots, wheresoever such person or persons may be.

(f) For Pollution Liabilities as described in the attached Pollution Exclusion and buyback wording.

(g) The provisions of California Senate Bill No. 1109 and the provisions of the agreements between San Francisco Bar Pilots and the owners, operators, charterers and agents of vessel on whose behalf piloting services are rendered have been made available to Assurer. It is the intent of the Assurer and the Assured that the Assured's legal liabilities that would otherwise be covered by the exculpatory and indemnification clauses set forth within California Senate Bill No. 1109 and within the pilot Contract and agreement as described above be insured by this policy, except as may be specifically excluded by the terms and conditions as shown below.

2.  Liability hereunder in respect to any one accident is limited to the amount of this policy; but the face value of this policy shall always remain at its original amount irrespective of any payments made or expenses incurred by the Assurer.

(a) It is understood and agreed that any payment in respect of liability for any one accident or occurrence shall not act to reduce the policy limits hereunder in respect of liability for any subsequent accident or occurrence, it being understood the full policy limit shall remain in full force and effect for each separate accident or occurrence during the entire period this policy is in force.

(b) However, it is also understood and agreed that the naming of any additional Assured(s) shall not serve to increase the policy limit in respect of any one accident or occurrence hereunder, notwithstanding the fact that liability may be asserted against more than one Assured, separately or combined.

(c) It is also understood and agreed that liability for all loss, damage, cost, or expense, including all costs of investigation, defense, negotiation or settlement shall be included in the policy limit and shall not exceed $1,000,000 in respect of any one accident or occurrence.

3.  The Assured shall give prompt written notice of all claims to Marsh Risk & Insurance Services, One California Street, San Francisco, CA 94111. All losses under this policy shall become due and payable within ninety (90) days after the submission of satisfactory proof thereof, and shall be paid to the Assured, or order.

4.   The Assurer shall be subrogated to all rights which Assured may acquire against any third person, entity or vessel, by reason of any payments made to the Assured upon claims upon which the Assured is entitled to be indemnified under this policy, to the extent of such payment, and the Assured shall, upon the request of the Assurer, execute all documents necessary to secure to the Assurer such rights.

5.   If any dispute arises under this policy the parties hereto shall submit the same to arbitration, for which purpose one arbitrator is to be chosen by the Assurer and one by the Assured. The two so chosen, if unable to agree shall select a third as umpire and the award of any two shall be final as between the parties. The cost of arbitration, including arbitrator's fees, shall be assessed by the arbitrators.

6.   Notwithstanding anything to the contrary, contained in the policy, this insurance is warranted free from any claim for loss, damage or expenses caused by or resulting from capture, seizure, arrest, restraint or detainment or the consequence thereof or of any attempt, threat, or any taking of the vessel, by requisition or otherwise, whether in time of peace or war and whether lawful or otherwise, also from consequences of hostilities or warlike operation (whether there by a declaration of war or not), piracy, civil war, revolution, rebellion or insurrection, or civil strife arising therefrom.

7.   Notwithstanding anything contained in the policy, this insurance is warranted free from any claim for loss, damage or expense caused solely by strikers, locked-out workmen or persons taking part in labor disturbances or riots or civil commotions.

8.   Notwithstanding anything contained in the policy, any shift or engagement involving air drafts of less than ten feet under the Golden Gate Bridge and/or Bay Bridge must be reported to Underwriters in advance of binding coverage under this Section, and may be subject to additional premium.

# SECTION C

## <u>Pilot's Contingent Legal Liability</u>

Subject to the terms and conditions set forth within this policy, Underwriters as shown below, hereinafter called the Assurer, by this policy of insurance do insure:

> San Francisco Bar Pilots, The San Francisco Bar Pilots Benevolent Association and their officers and employees and the individual Pilot performing the services insured hereunder

hereinafter called the Assured, in the sum insured stated above for each and every accident or occurrence herein after designated, against the liabilities of the Assured as hereinafter described, and subject to the terms and conditions hereinafter set forth.

The coverage provided by this policy attaches solely to the individual vessel movement for which trip insurance (as detailed in Section B hereunder) has NOT been ordered pursuant either to the provisions of California Senate Bill No. 1109 or to private agreement between the Assured and the owners, master, operators, charterers or agents of the vessel. The period of the coverage hereunder is limited to the period the pilot is aboard the vessel or piloting services are provided in connection with such movement.

The Assurer hereby undertakes to make good to the Assured or successors, all such loss and/or damage and/or expenses (limited to the amount of this policy) as the Assured shall have become liable to pay on account of the liabilities, risks, events, happenings, and/or occurrences herein set forth.

1.  The Assured under this policy is protected and indemnified for legal liabilities arising out of, or relating to, directly or indirectly, losses and/or damages and/or expenses which result while members of the San Francisco Bar Pilots are engaged in the piloting of vessels, including but not limited to:

    (a)  For loss or damage which may be caused to any other vessel, or waterborne craft of any description, by the vessel being navigated by the pilot.

    (b)  For loss or damage which may be caused to any wharves, piers, stages and similar structures, or any other property afloat or ashore, by the vessel being navigated by the pilot.

    (c)  For loss or damage which may be caused to the vessel being navigated by the pilot.

    (d)  For loss or damage, whether by collision or otherwise, which may be caused to any goods, merchandise, equipment or other thing of value whatsoever, whether on board any vessel or waterborne craft, or not, or to any vessel or

waterborne craft, pier, jetty, or other movable or fixed thing whatsoever.

(e) For loss of life or personal injury, whether by collision or otherwise, to any person other than employees of San Francisco Bar Pilots, wheresoever such person or persons may be.

(f) For Pollution Liabilities as described in the attached Pollution Exclusion and Buyback wording.

(g) The provisions of California Senate Bill No. 1109 and the provisions of the agreements between San Francisco Bar Pilots and the owners, operators, charterers and agents of vessel on whose behalf piloting services are rendered have been made available to Assurer. It is the intent of the Assurer and the Assured that the Assured's legal liabilities that would otherwise be covered by the exculpatory and indemnification clauses set forth within California Senate Bill No. 1109 and within the pilot Contract and agreements as described above be insured by this policy, except as may be specifically excluded by the terms and conditions as shown below.

2.  In the event that one of the named Assureds incurs liability to any other of the named Assureds in this policy, the policy shall cover the named Assured against whom claim is or may be made in the same manner as if separate policies had been issued to each named Assured.

However, it is understood and agreed that the foregoing Paragraph No. 2 does not increase the Limit(s) of Liability covered by this insurance.

3.  For the purpose of this insurance, it is understood and agreed that in case property damaged by an act or occurrence covered by this policy is owned by the Assured, the fact of such ownership shall not invalidate any claims, but shall be treated as if the property in question belonged to a third party, and the Assured shall be indemnified to the same extent and under the same conditions as if such were the case.

This clause applies only in situations where pilots as described above are engaged in the piloting of vessels in the course of their employment.

4.  Each claim for loss or damage, including costs of defense and attorneys fees, shall be adjusted separately and from the amount of each such adjusted claim or the limit of liability, whichever is the lesser, the sum of $2,500 shall be deducted.

(a) It is understood and agreed that any payment in respect of liability for any one accident or occurrence shall not act to reduce the policy limits hereunder in respect of liability for any subsequent accident or occurrence, it being understood the full policy limit shall remain in full force and effect for each separate accident or occurrence during the entire period this policy is in force.

    (b) However, it is also understood and agreed that the naming of any additional Assured(s) shall not serve to increase the policy limit in respect of any one accident or occurrence hereunder, notwithstanding the fact that liability may be asserted against more than one Assured, separately or combined.

    (c) It is also understood and agreed that liability for all loss, damage, cost, or expense, including all costs of investigation, defense, negotiation or settlement shall be included in the policy limit and shall not exceed $997,500 excess of $2,500 in respect of any one accident or occurrence.

5.     Liability hereunder in respect of any one accident is limited to the amount of this policy; but the face value of this policy shall always remain at its original amount irrespective of any payments made or expenses incurred by the Assurer.

6.     The Assured shall give prompt written notice of all claims to Marsh Risk & Insurance Services, One California Street, San Francisco, CA 94111. All losses under this policy shall become due and payable within ninety (90) days after the submission of satisfactory proof thereof, and shall be paid to the Assured, or order.

7.     The Assurer shall be subrogated to all rights which Assured may acquire against any third person, entity or vessel, by reason of any payments made to the Assured upon claims upon which the Assured is entitled to be indemnified under this policy, to the extent of such payment, and the Assured shall, upon the request of the Assurer, execute all documents necessary to secure to the Assurer such rights.

8.     It is understood and agreed that the Assurer will, at the written request of the Assured, defend on behalf of the Assured any claim hereunder or any suit or action at law that may possibly result in a claim hereunder, and that the costs of such defense, including attorneys' fees, are included as expenses and liabilities to which the limits of this policy apply. The Assured agrees to give its full cooperation in all matters relating to the defense of any such suit or action. Assured reserves the right to join and assist in such defense at their own expense. It is further understood and agreed with respect to claims within the Assured's retention that legal counsel shall be selected by the Assured.

9.     It is warranted by the Assured that it shall not be party to any agreement under which it may agree to assume liability for losses covered by this policy. Failure to comply with this warranty shall render this policy null and void as to coverage for those liabilities so assumed.

10.     If any dispute arises under this policy the parties hereto shall submit the same to arbitration, for which purpose one arbitrator is to be chosen by the Assurer and one by the Assured. The two so chosen, if unable to agree shall select a third as umpire and the award of any two shall be final as between the parties. The cost of arbitration, including arbitrator's fees, shall be assessed by the arbitrators.

11. It is warranted by the Assured that all pilots are currently and continuously licensed to perform pilotage in the San Francisco Bay and its tributaries or are authorized trainees.

12. This policy may be cancelled at any time at the request of the Assured or the Assurer by giving ninety (90) days notice in writing of such cancellation.

13. Notwithstanding anything to the contrary, contained in the policy, this insurance is warranted free from any claim for loss, damage or expenses caused by or resulting from capture, seizure, arrest, restraint or detainment or the consequence thereof or of any attempt, threat, or any taking of the vessel, by requisition or otherwise, whether in time of peace or war and whether lawful or otherwise, also from consequences of hostilities or warlike operation (whether there by a declaration of war or not), piracy, civil war, revolution, rebellion or insurrection, or civil strife arising therefrom.

14. Notwithstanding anything to the contrary contained in this policy, this insurance is warranted free of any claim for loss, damage or expense caused solely by strikers, locked-out workmen or persons taking part in labor disturbances or riots or civil commotion.

## AIMU U.S. ECONOMIC AND TRADE SANCTIONS CLAUSE

Whenever coverage provided by this policy would be in violation of any U.S. economic or trade sanctions such as, but not limited to, those sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), such coverage shall be null and void.

Similarly, any coverage relating to or referred to in any certificates or other evidences of insurance or any claim that would be in violation of U.S. economic or trade sanctions as described above shall also be null and void.

All other provisions of the Policy remain unchanged.

## EXTENDED RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE WITH U.S.A. ENDORSEMENT

### (American Institute of Marine Underwriters – March 1, 2003)

This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith.

1.   In no case shall this insurance cover loss damage liability or expense directly or indirectly caused by or contributed to by or arising from

    1.1   ionizing radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel

    1.2   the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof

    1.3   any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter.

    1.4   the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter.  The exclusion in this sub-clause does not extend to radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared, carried, stored, or used for commercial, agricultural, medical, scientific or other similar peaceful purposes.

## RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE (U.S.A. ENDORSEMENT)

This insurance is subject to the Extended Radioactive Contamination Exclusion Clause (March 1, 2003) provided that

> if fire is an insured peril

> and

> where the subject matter insured or, in the case of a reinsurance, the subject matter insured by the original insurance, is within the U.S.A., its islands, onshore territories or possessions

> and

> a fire arises directly or indirectly from one or more of the causes detailed in Sub-Clauses 1.1, 1.2, and 1.4 of the Extended Radioactive Contamination Exclusion Clause March 1, 2003 any loss or damage arising directly from that fire shall, subject to the provisions of this insurance (reinsurance), be covered, EXCLUDING however any loss damage liability or expense caused by nuclear reaction, nuclear radiation, or radioactive contamination arising directly or indirectly from that fire.

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of the Policy except as hereinbefore set forth.


## CHEMICAL, BIOLOGICAL, BIO-CHEMICAL, AND ELECTROMAGNETIC EXCLUSION CLAUSE

### (American Institute of Marine Underwriters – March 1, 2003)

This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith.

In no case shall this insurance cover loss, damage, liability or expense directly or indirectly caused by or contributed to or arising from an actual or threatened act  involving a chemical, biological, bio-chemical or electromagnetic weapon, device, agent or material when used in an intentionally hostile manner.

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of the Policy except as hereinbefore set forth.

## COVERAGE OF AND CAP ON LOSSES FOR CERTIFIED ACTS OF TERRORISM UNDER THE TERRORISM RISK INSURANCE ACT OF NOVEMBER 2002

In consideration of the premium allocation of $1,318.00 it is agreed as follows:

The policyholder has been previously notified of the availability of and the price for coverage of Certified Acts of Terrorism under the Federal Terrorism Risk Insurance Act of 2002. The Policyholder has opted to purchase such coverage under its policy.

This endorsement provides coverage for Certified Acts of Terrorism as follows:

"Certified Act of Terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002.

The federal Terrorism Risk Insurance Act of 2002 sets forth the following criteria for a Certified Act of Terrorism:

    a. The act resulted in aggregate losses in excess of $5 million; and

    b. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

This Policy provides coverage for losses arising from Certified Acts of Terrorism subject to all other terms and conditions of this policy.

Under the federal Terrorism Risk Insurance Act of 2002, any losses caused by Certified Acts of Terrorism will be partially reimbursed by the United States under a formula established by federal law. Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

With respect to any one or more Certified Acts of Terrorism, the Insurer will not pay any amounts for which the Insurer is not responsible under the terms of the federal Terrorism Risk Insurance Act of 2002 (including subsequent acts of Congress pursuant to the Act) due to the application of any clause in such law which results in a cap on the Insurer's liability for payments for terrorism losses.

All other provisions of the Policy remain unchanged.

Any provisions required by law to be printed in policies issued by a Subscriber thereto, shall be deemed to have been stated herein.

IN WITNESS WHEREOF, The Subscribers hereunder each severally, but not jointly, and not on the part of one for the other or any of the others have caused this policy to be signed by a duly authorized officer, attorney, or agent, this 1st day of January 2007.

| Subscriber | Amount Insured | Minimum & Deposit Premium | Authorized Signature |
|---|---|---|---|
| Continental Insurance Company – (Marine Office of America Corporation) | $1,000,000 | $70,335 | |

Commission: 17.5%



**COPY**     **ENDORSEMENT**

Endorsement No.: <u>1</u>              <u>**San Francisco, January 10, 2006**</u>

Endorsement to be attached to and made a part of Policy No.    **H 856049**

of                  **Continental Insurance Company**

issued to            **San Francisco Bar Pilots**

on     **Primary Trip Insurance and Pilot's Contingent Legal Liability Insurance**

Premium Adjustment for the period January 1, 2005 – 2006

In accordance with policy provisions, the Assured advises that for the period January 1, 2005 – 2006 there were 2 trips, shifts, or engagements where the Owner/Operator elected to purchase Trip Insurance coverage and 8,533 trips, shifts, or engagements Owner/Operator elected not to purchase Trip Insurance coverage. It is understood and agreed that additional premium is due as follows:

| | |
|---|---|
| Minimum and Deposit Premium = | $80,040.00 |
| | |
| 2 Trips @ $147.20 per Trip = | $294.40 |
| 8,533 Trips @ $10.80 per Trip = | <u>$92,156.40</u> |
| Total Earned Premium = | $92,450.80 |
| | |
| Earned Premium = | $92,450.80 |
| Deposit Premium = | <u>$80,040.00</u> |
| | |
| Additional Premium Due = | $12,410.80 |

All other terms and conditions remain unchanged.

**ENTERED**
Initial _____
Date _____

**Continental Insurance Company**
**(CNA Marine)**

_____

Authorized Signature

# ENDORSEMENT

Endorsement No.: **1**                               San Francisco, January 11, 2007

Endorsement to be attached to and made a part of Policy No.   **H 856049**

of                              **Continental Insurance Company**

issued to                       **San Francisco Bar Pilots**

on        **Primary Trip Insurance and Pilot's Contingent Legal Liability Insurance**

Premium Adjustment for the period January 1, 2006 – 2007

In accordance with policy provisions, the Assured advises that for the period January 1, 2006 – 2007 there was 1 trip, shift, or engagement where the Owner/Operator elected to purchase Trip Insurance coverage and 9,591 trips, shifts, or engagements Owner/Operator elected not to purchase Trip Insurance coverage.  It is understood and agreed that additional premium is due as follows:

| | |
|---|---|
| Minimum and Deposit Premium = | $76,038.00 |
| 1 Trip @ $139.84 per Trip = | $139.84 |
| 9,591 Trips @ $10.26 per Trip = | $98,403.66 |
| Total Earned Premium = | $98,543.50 |
| Earned Premium = | $98,543.50 |
| Deposit Premium = | $76,038.00 |
| Additional Premium Due = | $22,505.50 |

All other terms and conditions remain unchanged.

**Continental Insurance Company**
(CNA Marine)

Authorized Signature

ENTE
Initial
Date

C:\Documents and Settings\c24108\\Local Settings\Temporary Internet Files\OLK33\Primary Trip Policy Adjustment Endorsement (d).doc

**EXHIBIT B**

AO 257 (Rev. 6/78)

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION – IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT   ☒ INFORMATION   ☐ INDICTMENT
☐ SUPERSEDING

--- OFFENSE CHARGED ---

Count One: 33 U.S.C. §§ 1319(c)(1), 1321(b)(3) -
(Clean Water Act - Negligent Discharge of a Pollutant);

Count Two: 16 U.S.C. §§ 703 and 707(a) -
(Migratory Bird Treaty Act)

☐ Petty
☐ Minor
☒ Misde-meanor
☐ Felony

*E-filing*

PENALTY:   Count One: 1 year imprisonment, $100,000 fine, 1 year supervised
release, $25 special assessment
Count Two: 6 months imprisonment, $15,000 fine, 1 year
supervised release, $10 special assessment

Name of District Court, and/or Judge/Magistrate Location

**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

--- DEFENDANT - U.S. ---

JOHN JOSEPH COTA

DISTRICT COURT NUMBER

--- PROCEEDING ---

Name of Complainant Agency, or Person (& Title, if any)

U.S. COAST GUARD/ENVIRONMENTAL PROTECTION AGENCY

☐ person is awaiting trial in another Federal or State Court,
give name of court

☐ this person/proceeding is transferred from another district
per (circle one) FRCrp 20, 21, or 40.  Show District

☐ this is a reprosecution of
charges previously dismissed
which were dismissed on motion
of:
   ☐ U.S. ATTORNEY   ☐ DEFENSE
} SHOW
DOCKET NO.

☐ this prosecution relates to a
pending case involving this same
defendant
MAGISTRATE
CASE NO.

☐ prior proceedings or appearance(s)
before U.S. Magistrate regarding this
defendant were recorded under

Name and Office of Person
Furnishing information on this form     JOSEPH P. RUSSONIELLO

☒ U.S. Attorney   ☐ Other U.S. Agency

Name of Assistant U.S.
Attorney (if assigned)        STACEY GEIS/DAVID JOYCE

--- DEFENDANT ---

**IS NOT IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior
summons was served on above charges ▶

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**
4) ☐ On this charge

5) ☐ On another conviction

6) ☐ Awaiting trial on other charges
} ☐ Federal   ☐ State

If answer to (6) is "Yes", show name of institution

Has detainer   ☐ Yes      If "Yes"
been filed?    ☐ No    } give date
filed

DATE OF
ARREST ▶           Month/Day/Year

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED       Month/Day/Year
TO U.S. CUSTODY ▶

☐ This report amends AO 257 previously submitted

## ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☐ SUMMONS   ☒ NO PROCESS*   ☐ WARRANT       Bail Amount:

If Summons, complete following:
☐ Arraignment   ☐ Initial Appearance    * Where defendant previously apprehended on complaint, no new summons or
warrant needed, since Magistrate has scheduled arraignment

Defendant Address:

Date/Time:                    Before Judge:

Comments:

*E-filing*

1   JOSEPH P. RUSSONIELLO
    United States Attorney
2   BRIAN J. STRETCH (CASBN 163973)
    Chief, Criminal Division
3   STACEY P. GEIS (CASBN 181444)
    JONATHAN SCHMIDT (CASBN 230646)
4   Assistant United States Attorneys
    450 Golden Gate Ave., 11th Floor
5   San Francisco, CA 94102
    (415) 436-6776 (tel)
6   (415) 436-7234 (fax)
    Jonathan.Schmidt@usdoj.gov
7

8   RONALD J. TENPAS
    Assistant Attorney General
9   Environment and Natural Resources Division
    United States Department of Justice
10  DAVID B. JOYCE
    Trial Attorney
11  Environmental Crimes Section
    P.O. Box 23985
12  L'Enfant Plaza Station
    Washington, DC 20004
13  (202) 305-0321 (tel)
    (202) 305-0396 (fax)
14  David.Joyce@usdoj.gov

15
    Attorneys for Plaintiff
16  United States of America

17
                    UNITED STATES DISTRICT COURT
18
                  NORTHERN DISTRICT OF CALIFORNIA
19
                     SAN FRANCISCO DIVISION
20

21
                                      )
22  UNITED STATES OF AMERICA,         )   No. CR
                                      )
23       Plaintiff,                   )   VIOLATIONS:
                                      )
24  v.                                )   Title 33 U.S.C. §§ 1319(c)(1)(A),
                                      )   1321(b)(3) (Clean Water Act) (one
25  JOHN JOSEPH COTA,                 )   count)(a Class A misdemeanor);
                                      )   Title 16 U.S.C. §§ 703, 707
26       Defendant.                   )   (Migratory Bird Treaty Act) (one count)
                                      )   (a Class B Misdemeanor)
27                                    )
                                      )
28  _____   )

*MAG*

# INFORMATION

The United States Attorney charges:

## INTRODUCTION

At all times relevant to this Information:

1. The *M/V Cosco Busan* was a 901 foot, 65,131 gross ton container ship registered in Hong Kong and bearing IMO number 9231743.

2. The Defendant, JOHN JOSEPH COTA, was a resident of Petaluma, California, and was a member of the San Francisco Bar Pilots. COTA was licensed both by the United States Coast Guard and the State of California as a Pilot. COTA had been employed as a Pilot in San Francisco Bay since 1981.

3. On November 7, 2007, the *M/V Cosco Busan* departed the Port of Oakland in heavy fog and struck the Delta span of the San Francisco Bay Bridge, which resulted in the discharge of approximately 58,000 gallons of heavy fuel oil and caused environmental damage, including the loss of migratory birds.

## LEGAL FRAMEWORK

### The Clean Water Act and the Oil Pollution Act

4. In the Federal Water Pollution Control Act (the "Clean Water Act"), as amended by the Oil Pollution Act, 33 U.S.C. § 1321(b)(1), Congress has declared that it is the policy of the United States that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States or the adjoining shorelines.

5. The Clean Water Act makes it a crime for a person to negligently discharge oil into or upon the navigable waters or contiguous zone of the United States in such quantities as may be harmful. 33 U.S.C. §§ 1319(c)(1) and 1321(b)(3).

6. The Clean Water Act defines a "discharge" as any spilling, leaking, pumping, pouring, emitting, emptying or dumping. 33 U.S.C. § 1321(a)(2). The Clean Water Act defines "oil" as oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge and oil residue. 33 U.S.C. § 1321(a)(1).

2

1    7. Federal regulations promulgated under the Clean Water Act define a "harmful"

2    quantity of oil as including any discharges of oil that cause a film or sheen upon or

3    discoloration of the surface of the water or adjoining shorelines or cause a sludge or

4    emulsion to be deposited beneath the surface of the water or adjoining shorelines.  40

5    C.F.R. § 110.3

6    8. The Clean Water Act defines the "navigable waters" of the United States as the

7    waters of the United States and the territorial seas, which are defined to be water

8    extending three (3) miles seaward of the ordinary low tide mark.  33 U.S.C. §§ 1362(7)

9    and 1362(8).  Navigable waters also includes internal waters, which are "the waters

10    shoreward of the territorial sea baseline." 33 C.F.R. §§ 2.24(a); 2.36.  San Francisco Bay

11    is a navigable waterway of the United States.

12    <u>The Migratory Bird Treaty Act</u>

13    9. The Migratory Bird Treaty Act ("MBTA") makes it unlawful for any person, at any

14    time, by any means or in any manner, to take or kill any migratory bird without a permit

15    or as otherwise provided by regulation.  16 U.S.C. §§ 703, 707(a).

16    10. The term "take" in the MBTA includes killing or wounding.  50 C.F.R. § 10.12.

17    11. The Brown Pelican (*Pelecanus occidentalis*), Marbled Murrelet, (*Brachyramphus*

18    *marmoratus*), and Western Grebe, (*Aechmophorus occidentalis*), among others, are listed

19    as migratory birds pursuant to the MBTA.  50 C.F.R. § 10.13.

20

21    ///

22

23    ///

24

25    ///

26

27    ///

28

## Count One -- 33 U.S.C. §§ 1319(c)(1), 1321(b)(3)
### (Clean Water Act – Negligent Discharge of a Pollutant)

12.  Paragraphs 1-8 are realleged and incorporated by reference as though fully set forth herein.

13.  On or about November 7, 2007, in San Francisco Bay, within the Northern District of California, the defendant,

JOHN JOSEPH COTA,

did negligently cause the discharge of oil in such quantities as may be harmful from a vessel, the *M/V Cosco Busan*, into and upon the navigable waters of the United States, without a permit.  Specifically, on or about November 7, 2007, Defendant Cota, while piloting the *M/V Cosco Busan*, caused approximately 58,000 gallons of heavy fuel oil to be discharged from the vessel into San Francisco Bay by acting in a negligent manner, that included the following: (a) failing to pilot a collision free course; (b) failing to adequately review with the Captain and crew of the *M/V Cosco Busan* prior to departure the official navigational charts of the proposed course, the location of the San Francisco Bay aids to navigation, and the operation of the vessel's navigational equipment; (c) departing port in heavy fog and then failing to proceed at a safe speed during the voyage despite limited visibility; (d) failing to use the vessel's radar while making the final approach to the Bay Bridge; (e) failing to use positional fixes during the voyage; and (f) failing to verify the vessel's position vis-à-vis other established and recognized aids to navigation throughout the voyage.

All in violation of Title 33, United States Code, Sections 1319(c)(1)(A) and 1321(b)(3), a Class A misdemeanor.

///

///

4

### Count Two – 16 U.S.C. §§ 703 and 707(a)
### (Migratory Bird Treaty Act)

14.  Paragraphs 1-13 are realleged and incorporated by reference as though fully set forth herein.

15.  On or about November 7, 2007, in San Francisco Bay, within the Northern District of California, the defendant,

### JOHN JOSEPH COTA,

without being permitted to do so by regulation as required by law, did take migratory birds, including at least one Brown Pelican, (*Pelecanus occidentalis*), Marbled Murrelet, (*Brachyramphus marmoratus*), and Western Grebe, (*Aechmophorus occidentalis*).

All in violation of Title 16, United States Code, Sections 703 and 707(a), and Title 50, Code of Federal Regulations, Sections 21.11, 20.71 and 20.72, a Class B misdemeanor.

JOSEPH P. RUSSONIELLO
United States Attorney
BRIAN J. STRETCH
Chief, Criminal Division

By: _____
STACEY P. GEIS
Assistant United States Attorney

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources
Division
United States Department of Justice

By: _____
DAVID B. JOYCE
Trial Attorney
Environmental Crimes Section

5

AO 257 (Rev. 6/78)

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT   ☐ INFORMATION   ☒ INDICTMENT

☒ SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

— OFFENSE CHARGED —

Count 1: 18 U.S.C. § 1001 (False Statements)   ☐ Petty
Count 2: 18 U.S.C. § 1001 (False Statements)
Count 3: 33 U.S.C. §§ 1319(c)(1), 1321(b)(3)   ☐ Minor
    (Clean Water Act - Negligent Discharge of a Pollutant)
Count 4: 16 U.S.C. §§ 703 and 707(a)           ☐ Misde-
    (Migratory Bird Treaty Act)                     meanor

                                                ☒ Felony

PENALTY:  Count 1 & 2: 5 years imprisonment, $250,000 fine, 3 years
supervised release, $100 special assessment; Count 3: 1 year
imprisonment, $100,000 fine, 1 year supervised release, $25 special
assessment; Count 4: 6 month imprisonment, $15,000 fine, 1 year
supervised release, $10 special assessment.

— DEFENDANT - U.S —

► JOHN JOSEPH COTA

DISTRICT COURT NUMBER
CR 08-0160 JCS

— PROCEEDING —

Name of Complaintant Agency, or Person (& Title, if any)

U.S. COAST GUARD/EPA

☐ person is awaiting trial in another Federal or State Court,
give name of court

☐ this person/proceeding is transferred from another district
per (circle one) FRCrp 20, 21, or 40.  Show District

☐ this is a reprosecution of
charges previously dismissed
which were dismissed on motion
of:                                       SHOW
                                       DOCKET NO.
   ☐ U.S. ATTORNEY   ☐ DEFENSE    }

☐ this prosecution relates to a
pending case involving this same
defendant                             MAGISTRATE
                                      CASE NO.

☒ prior proceedings or appearance(s)
before U.S. Magistrate regarding this
defendant were recorded under      CR-08-0160 MAG

Name and Office of Person
Furnishing Information on this form   JOSEPH P. RUSSONIELLO
                                   ☒ U.S. Attorney   ☐ Other U.S. Agency

Name of Assistant U.S.
Attorney (if assigned)       J. SCHMIDT/STACEY GEIS

— DEFENDANT —

IS *NOT* IN CUSTODY
    Has not been arrested, pending outcome this proceeding.
1) ☐ If not detained give date any prior
     summons was served on above charges ►

2) ☐ Is a Fugitive

3) ☒ Is on Bail or Release from (show District)

NDCA

IS IN CUSTODY

4) ☐ On this charge

5) ☐ On another conviction                  }  ☐ Federal   ☐ State

6) ☐ Awaiting trial on other charges
     If answer to (6) is "Yes", show name of institution

Has detainer  ☐ Yes    If "Yes"
been filed?                }  give date
              ☐ No           filed

DATE OF      ►             Month/Day/Year
ARREST

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED   ►       Month/Day/Year
TO U.S. CUSTODY

☐ This report amends AO 257 previously submitted

## ADDITIONAL INFORMATION OR COMMENTS

PROCESS:

☐ SUMMONS   ☒ NO PROCESS*   ☐ WARRANT      Bail Amount:

If Summons, complete following:
☐ Arraignment   ☐ Initial Appearance     * Where defendant previously apprehended on complaint, no new summons or
                                          warrant needed, since Magistrate has scheduled arraignment
Defendant Address:

                                       Date/Time:                    Before Judge:

Comments:

# United States District Court

### FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

VENUE: San Francisco

UNITED STATES OF AMERICA,

**V.**

JOHN JOSEPH COTA,

*[signature]*

### DEFENDANT.

---

SUPERSEDING INDICTMENT

Violations: Title 18, United States Code §
1001 (false statements) (two counts); Title 33
United States Code §§ 1319(c)(1)(A), 1321(b)
(3) (Clean Water Act) (one count)(a Class A
misdemeanor); Title 16 United States Code §§
703, 707 (Migratory Bird Treaty Act) (one
count) (a Class B Misdemeanor)

---

A true bill.

_____
                    Foreman

Filed in open court this **22** day of
**APRIL 2008**
_____
                    Clerk

Bail, $ **NO PROCESS**

1   JOSEPH P. RUSSONIELLO
    United States Attorney
2   BRIAN J. STRETCH (CASBN 163973)
    Chief, Criminal Division
3   STACEY P. GEIS (CASBN 181444)
    JONATHAN SCHMIDT (CASBN 230646)
4   Assistant United States Attorneys
    450 Golden Gate Ave., 11th Floor
5   San Francisco, CA 94102
    (415) 436-7126 (tel)
6   (415) 436-7234 (fax)
    Stacey.Geis@usdoj.gov
7   Jonathan.Schmidt@usdoj.gov

8
    RONALD J. TENPAS
9   Assistant Attorney General
    Environment and Natural Resources Division
10  United States Department of Justice
    Richard A. Udell
11  Senior Trial Attorney
    Environmental Crimes Section
12  P.O. Box 23985
    L'Enfant Plaza Station
13  Washington, DC 20004
    (202) 305-0361 (tel)
14  (202) 514-8865 (fax)
    Richard.Udell@usdoj.gov
15
    Attorneys for Plaintiff
16  United States of America

17
                    UNITED STATES DISTRICT COURT
18
                  NORTHERN DISTRICT OF CALIFORNIA
19
                        SAN FRANCISCO DIVISION
20

21
                                      )   No. CR 08 -00160-JCS
22  UNITED STATES OF AMERICA,         )
                                      )   VIOLATIONS:
23      Plaintiff,                    )   Title 18 U.S.C. § 1001 (false statements)
                                      )   (two counts);
24  v.                               )   Title 33 U.S.C. §§ 1319(c)(1)(A),
                                      )   1321(b)(3) (Clean Water Act) (one
25  JOHN JOSEPH COTA,                 )   count)(a Class A misdemeanor);
                                      )   Title 16 U.S.C. §§ 703, 707
26      Defendant.                    )   (Migratory Bird Treaty Act) (one count)
                                      )   (a Class B Misdemeanor)
27                                    )
                                      )
28                                    )

## S U P E R S E D I N G   I N D I C T M E N T

The Grand Jury charges:

## INTRODUCTION

At all times relevant to this Indictment:

1. The Defendant, JOHN JOSEPH COTA, was a resident of Petaluma, California, and a member of the San Francisco Bar Pilots Association. He held a federal first class pilot's license issued by the United States Coast Guard, and a state pilot's license issued by the Board of Pilot Commissioners for the Bays of San Francisco, San Pablo and Suisun. COTA had been employed as a Pilot in San Francisco Bay since 1981.

2. The *M/V Cosco Busan* was a 901 foot, 65,131 gross ton container ship registered in Hong Kong and bearing IMO number 9231743.

3. On November 7, 2007, the *M/V Cosco Busan,* with JOHN JOSEPH COTA as its pilot, departed the Port of Oakland in heavy fog and struck the Delta tower of the San Francisco Bay Bridge, which resulted in the discharge of more than 50,000 gallons of heavy fuel oil and caused environmental damage, including the loss of migratory birds.

## LEGAL FRAMEWORK

### Federal Requirements for Licensed Pilot's Annual Medical Exam

4. Title 46 U.S.C. § 7101 together with 46 C.F.R. §10.709 mandates that "every person holding a license or endorsement as a first class pilot shall have a thorough physical examination each year while holding a license or endorsement." 46 C.F.R. § 10.709(b). Further, an individual with a first class license or endorsement "may not operate under authority of that license or endorsement until a physical examination has been satisfactorily completed." 46 C.F.R. §10.709(d). The exam must be given by a licensed physician or physician assistant who completes a Coast Guard physical examination form or the equivalent. 46 C.F.R.§§ 10.205(d), 10.709(d).

### The Clean Water Act and the Oil Pollution Act

5. In the Federal Water Pollution Control Act (the "Clean Water Act"), as amended by the Oil Pollution Act, 33 U.S.C. § 1321(b)(1), Congress has declared that it is the

2

1   policy of the United States that there should be no discharges of oil or hazardous

2   substances into or upon the navigable waters of the United States or the adjoining

3   shorelines.

4       6. The Clean Water Act makes it a crime for a person to negligently discharge oil into

5   or upon the navigable waters or contiguous zone of the United States in such quantities as

6   may be harmful.  33 U.S.C. §§ 1319(c)(1) and 1321(b)(3).

7       7. The Clean Water Act defines a "discharge" as any spilling, leaking, pumping,

8   pouring, emitting, emptying or dumping.  33 U.S.C. § 1321(a)(2).  The Clean Water Act

9   defines "oil" as oil of any kind or in any form, including, but not limited to, petroleum,

10  fuel oil, sludge and oil residue.  33 U.S.C. § 1321(a)(1).

11      8. Federal regulations promulgated under the Clean Water Act define a "harmful"

12  quantity of oil as including any discharges of oil that cause a film or sheen upon or

13  discoloration of the surface of the water or adjoining shorelines or cause a sludge or

14  emulsion to be deposited beneath the surface of the water or adjoining shorelines.  40

15  C.F.R. § 110.3

16      9. The Clean Water Act defines the "navigable waters" of the United States as the

17  waters of the United States and the territorial seas, which are defined to be water

18  extending three (3) miles seaward of the ordinary low tide mark.  33 U.S.C. §§ 1362(7)

19  and 1362(8).  Navigable waters also includes internal waters, which are "the waters

20  shoreward of the territorial sea baseline." 33 C.F.R. §§ 2.24(a); 2.36.  San Francisco Bay

21  is a navigable waterway of the United States.

22                      The Migratory Bird Treaty Act

23      10. The Migratory Bird Treaty Act ("MBTA") makes it unlawful for any person, at

24  any time, by any means or in any manner, to take or kill any migratory bird without a

25  permit or as otherwise provided by regulation.  16 U.S.C. §§ 703, 707(a).

26      11. The term "take" in the MBTA includes killing or wounding.  50 C.F.R. § 10.12.

27      12. The Brown Pelican (*Pelecanus occidentalis*), Marbled Murrelet, (*Brachyramphus*

28  *marmoratus*), and Western Grebe, (*Aechmophorus occidentalis*), among others, are listed

3

1   as migratory birds pursuant to the MBTA.  50 C.F.R. § 10.13.

2   **Count One -- 18 U.S.C. §1001**<br>**(False Statements)**

3

4     13.  Paragraphs 1-4 are realleged and incorporated by reference as though fully set

forth herein.

5

6     14.  On or about January 18, 2006, in the Northern District of California, the

defendant,

7

8   JOHN JOSEPH COTA,

9   knowingly and willfully made a materially false, fictitious, and fraudulent statement and

representation in a matter within the jurisdiction of the executive branch of the

10

11   Government of the United States, specifically on United States Coast Guard Form CG-

719K – Merchant Mariner Physical Examination Report – in that he certified that all the

12

13   information he provided was complete and true to the best of his knowledge, when in fact

he knew that the information he provided was neither complete nor true; including the

14

15   information provided in Sections VI and VII of the form regarding current medications,

the dosage, possible side effects and medical conditions for which the medications are

16

17   taken.

    All in violation of Title 18, United States Code, Section 1001(a)(2).

18   //

19   //

20   //

21   //

22   //

23   //

24   ///

25   //

26   //

27

28

4

1

## Count Two -- 18 U.S.C. §1001
### (False Statements)

2

3    15.  Paragraphs 1-4 are realleged and incorporated by reference as though fully set

forth herein.

4

5    16.  On or about January 19, 2007, in the Northern District of California, the defendant,

JOHN JOSEPH COTA,

6

7    knowingly and willfully made a materially false, fictitious, and fraudulent statement and

representation in a matter within the jurisdiction of the executive branch of the

8

9    Government of the United States, specifically on United States Coast Guard Form CG-

719K – Merchant Mariner Physical Examination Report –  in that he certified that all the

10

11   information he provided was complete and true to the best of his knowledge, when in fact

he knew that the information he provided was neither complete nor true; including the

12

13   information provided in Sections VI and VII of the form regarding current medications,

the dosage, possible side effects and medical conditions for which the medications were

14

taken.

15

16   All in violation of Title 18, United States Code, Section 1001(a)(2).

//

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27

28

5

## Count Three -- 33 U.S.C. §§ 1319(c)(1), 1321(b)(3)
### (Clean Water Act – Negligent Discharge of a Pollutant)

17. Paragraphs 1-10 are realleged and incorporated by reference as though fully set forth herein.

18. On or about November 7, 2007, in San Francisco Bay, within the Northern District of California, the defendant,

### JOHN JOSEPH COTA,

did negligently discharge and cause the discharge of oil in such quantities as may be harmful from a vessel, the *M/V Cosco Busan*, into and upon the navigable waters of the United States, without a permit.  Specifically, on or about November 7, 2007, Defendant Cota, while piloting the *M/V Cosco Busan*, negligently caused more than 50,000 gallons of heavy fuel oil to be discharged from the vessel into San Francisco Bay by acting in a negligent manner, that included, the following: (a) failing to pilot a collision free course; (b) failing to adequately review with the Captain and crew of the *M/V Cosco Busan* prior to departure the official navigational charts of the proposed course, the location of the San Francisco Bay aids to navigation, and the operation of the vessel's navigational equipment; (c) departing port in heavy fog and then failing to proceed at a safe speed during the voyage despite limited visibility; (d) failing to use the vessel's radar while making the final approach to the Bay Bridge; (e) failing to use positional fixes during the voyage; and (f) failing to verify the vessel's position vis-à-vis other established and recognized aids to navigation throughout the voyage.

All in violation of Title 33, United States Code, Sections 1319(c)(1)(A) and 1321(b)(3), a Class A misdemeanor.

//

//

//

//

6

1

**Count Four – 16 U.S.C. §§ 703 and 707(a)**
**(Migratory Bird Treaty Act)**

2

3     19. Paragraphs 1-13 are realleged and incorporated by reference as though fully set

forth herein.

4

5     20. On or about November 7, 2007, in San Francisco Bay, within the Northern District

of California, the defendant,

6

7                        JOHN JOSEPH COTA,

8     without being permitted to do so by regulation as required by law, did take migratory

birds, including at least one Brown Pelican, (*Pelecanus occidentalis*), Marbled Murrelet,

9

(*Brachyramphus marmoratus*), and Western Grebe, (*Aechmophorus occidentalis*).

10

All in violation of Title 16, United States Code, Sections 703 and 707(a), and Title 50,

11

Code of Federal Regulations, Sections 21.11, 20.71 and 20.72, a Class B misdemeanor.

12

13

14

DATED:                          A TRUE BILL.

15

16                              _Amelmekemendere_

17                              FOREPERSON

18

JOSEPH P. RUSSONIELLO

19    United States Attorney

20

21

22    BRIAN J. STRETCH
Chief, Criminal Division

23    (Approved as to form: _____)
AUSA Geis

24

25    RONALD J. TENPAS
Assistant Attorney General

26

27    Richard A. Udell
Senior Trial Attorney

28    Environmental Crimes Section

7